IN THE UNITED STATES DISTRCT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| Plaintiff, | : |
| v. | : CRIMINAL CASE NO. |
| DAJOUR HIGH, | : 1:23-CR-407-04-SEG-JSA |
| Defendant. | : |

**REPORT AND RECOMMENDATION**

Defendant moves to suppress the results of a warrantless search of his vehicle. After an evidentiary hearing and the receipt of post-hearing briefs, the Court finds that the officers had reasonable suspicion of a traffic violation sufficient to initiate a traffic stop and developed probable cause that the vehicle contained narcotics sufficient to conduct a search. Thus, the Court **RECOMMENDS** that the Motion [66] be **DENIED**.

I.     FACTS

The following facts are drawn from the testimony and exhibits adduced at the evidentiary hearing on August 19, 2024, at which former Georgia State Patrol Office Brodie Forrester testified. *See* Transcript "Tr." [82].

1

On March 16, 2021, Forrester (then still with the GSP) was asked to assist with a drug investigation undertaken by the U.S. High Intensity Drug Trafficking Area Task Force ("HIDTA"). Tr. at 14. Forrester was a certified handler of a drug-detecting K-9, named "Bull," who was present with Forrester during the operation. *Id*. at 10-11.

Forrester was added to a WhatsApp group chat involving other law enforcement officers working on the operation shortly after 2:00 pm on March 16, 2021. The investigation had been underway for several hours at that point and the chat itself began at approximately 10:00 a.m. However, Forrester did not have personal knowledge of anything observed or other facts known to the other investigators prior to Forrester being added to the chat, and the Government called no other witnesses to establish the investigative findings known by that point. The WhatsApp chat involving Forrester was introduced at the evidentiary hearing as Gov't Exhibit 2.

After Forrester was added to the chat, another investigator posted an entry referring to the fact that a driver of a red Ford Mustang had previously been involved in a transaction involving five kilograms, presumably of some unidentified narcotics. There was no clear statement in this thread or otherwise explained by any witness as to whether that particular person or any red Ford Mustang was currently present and being surveilled in the events that led up to the

2

detention of Defendant. The minimal discussion in the chat then referred to a different Ford vehicle – a Ford Fusion – seen in a PetSmart parking lot and that the driver of the "Ford" (presumably the Fusion) put some bags or containers in the trunk of the Altima or vice-versa. *See* Gov't Ex. 2.  It was not explained in the chat whether the "Ford" observed in this interaction was the Fusion or the Mustang supposedly previously observed in a drug transaction. No context or substantial other information was introduced to explain the background behind the minimal entries in the chat.

Forrester did not observe this transaction. His task was to follow the Nissan Altima and conduct a traffic stop. At some point, another officer stated in the chat that the Altima had crossed a yellow road line. Forrester testified that he personally observed that the Altima did not have its main lights illuminated despite it being a cloudy and rainy day, which would be a violation of Georgia traffic law. Tr. at 24-25. According to Forrester, the conditions were "drizzly," and did not involve heavy rain. *Id*. Based on this headlights violation, Forrester stopped the Altima. *Id*. at 24-28.

A video recorded by Forrester's dashboard camera as his lights were activated and continuing through the traffic stop was introduced in evidence as Government Exhibit 3. The parties dispute from this and other footage introduced at the hearing whether it was actually raining at the time of the traffic stop. It is

undisputed that the footage shows wet road conditions and water splashing on Forrester's windshield at the time he initiated his dashboard camera, although Defendant contends that the moisture more likely resulted from water spraying up from the wet road than from actual rain.

After pulling over the Altima, Forrester approached the car and ordered the driver (later identified as the Defendant) out of the car after seeing a gun in the backseat. Tr. at 28. Forrester told Defendant that the stop was based on the Defendant's failure to have his headlights illuminated in the rain. *Id*. at 29-30. Defendant stated that his fog lights were illuminated but did not dispute that the headlights were not illuminated or that it had been raining. *Id*.

Defendant told Forrester that he was in town to visit his girlfriend and to transport a bag of her belongings from Georgia to North Carolina, although he had never been "down South" previously. He said that he met his girlfriend's father in the parking lot of a PetSmart, and that the father had brought the girlfriend's belongings and some of Defendant's own belongings to the PetSmart to give to Defendant. *See* Gov't Ex. 3-Video 2 at 3:00-9:00.

Forrester requested consent to search the car, which Defendant declined. Forrester then passed along Defendant's identification, the gun and other information to another officer to conduct database searches, while Forrester retrieved Bull to conduct an open-air sniff around the Altima. *Id.* at 10:00-12:00.

Forrester and Bull held current certifications as a K-9 handler and drug-detecting K-9, respectively. Tr. at 12-13, Gov't Ex. 1. Bull was certified to detect marijuana, cocaine, methamphetamine, heroin and PCP. *Id.* Bull received 8 weeks of "pre-training" in which he was trained to detect and alert to the odors of the drugs and then he and Forrester received six weeks of training together, culminating in a final examination in which they needed to accurately detect the presence of several hidden drugs to receive certification. Tr. at 12-14. They also were required to undergo periodic monthly training and annual recertification exams which involved successful detection of hidden drugs. *Id*. Bull never failed a certification or re-certification examination. *Id*.

During the traffic stop, Forrester led Bull around the Altima counter-clockwise several times. Forrester explained that, using his hand, he would display certain spots on the car for Bull to sniff, including door and window seams from which odors might emanate. Bull's initial alerts to the presence of drug odors involved changing of breathing and other indications that Forrester acknowledged were not discernable on the video. Forrester also explained that Bull would lash his head around to indicate that he was smelling narcotics and that the final indication was that Bull would sit down at the spot where he could not work the odors any closer than he already had. Tr. at 34-35; Gov't Ex. 3-Video 2 at 12:00-16:00. Forrester explained, with reference to the video, that Bull alerted in these respects

5

to the presence of narcotics odors emanating from the Altima. *Id*. After the positive alerts, the officers conducted a search of the Altima and in the trunk found 10 bricks of suspected cocaine contained within 2 shopping bags. Tr. at 76; Gov't Ex. 3-Video 2 at 20:00-21:00.

## II.     ARGUMENT

The Fourth Amendment to the United States Constitution protects the right of persons to be free from unreasonable searches and seizures.  U.S. CONST. AMEND. IV.  "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home [or other private property] without a warrant are presumptively unreasonable."  *Payton v. New York*, 445 U.S. 573, 586 (1980); *United States v. Santa*, 236 F.3d 662, 668 (11th Cir. 2000).  Upon a motion to suppress evidence garnered through a warrantless search and seizure, the burden of proof as to the reasonableness of the search rests with the prosecution.  *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983) (*citing United States v. Impson*, 482 F.2d 197 (5th Cir. 1973)). Thus, the government must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the Fourth Amendment.  *Vale v. Louisiana*, 399 U.S. 30, 34 (1969); *United States v. Jeffers*, 342 U.S. 48, 51 (1951).

It is undisputed that the investigators in this case lacked a warrant authorizing the search of Defendant's vehicle. Under the automobile exception, however, a warrantless search of a car is constitutional if the car is "readily mobile" and probable cause exists to believe that it contains contraband or evidence of a crime. *United States v. Lanzon*, 639 F.3d 1293, 1299–1300 (11th Cir. 2011); *United States v. Watts*, 329 F.3d 1282, 1286 (11th Cir. 2003).

Defendant argues that the evidence obtained in the warrantless search must be suppressed because the officers lacked probable cause or reasonable suspicion of criminal activity and because the K-9 search was not sufficiently reliable. The Government argues against suppression, arguing that Forrester had at least reasonable suspicion that the Altima had committed traffic violations, and had probable cause that narcotics were present in the car based on the surveillance facts already known to the officers and/or the results of the K-9 search.

1. *The Reasonableness of the Traffic Stop*

Probable cause is not required to justify a mere investigative stop; reasonable suspicion is sufficient for that purpose. *United States v. Powell*, 222 F.3d 913, 917-918 (11th Cir. 2000); *United States v. Mikell*, 102 F.3d 470, 474-475 (11th Cir. 1996). Specifically, to briefly stop a vehicle, an officer must have reasonable and articulable suspicion that the occupants are engaged in criminal activity, including traffic violations. *Terry v. Ohio*, 392 U.S. 1 (1968); *United*

7

*States v. Sharpe*, 470 U. S. 675 (1985). To make a showing that in fact the officers had reasonable suspicion, they "must be able to articulate more than an 'inchoate and unparticularized suspicion or 'hunch' of criminal activity.'" *Illinois v. Wardlow*, 528 U.S. 119, 123-124 (2000) (*quoting Terry*, 392 U.S. at 27).

Whether a detention or search is based on requisite levels of knowledge can in appropriate cases be viewed in light of the "collective knowledge" doctrine. This doctrine allows a court to impute the knowledge of one or more other officers to the one who specifically engages in the search or other conduct at issue. *See, e.g., United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985) ("Probable cause . . . exists where the facts and circumstances within the collective knowledge of law enforcement officials, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed."). The collective knowledge of officers may be considered "if they maintained at least a minimal level of communication during their investigation." *Willis*, 759 F.2d at 1494.

The Government asserts that Forrester's stop of the Altima was justified based on reasonable suspicion or even probable cause of ongoing drug violations, based on the officers' surveillance of a suspected drug transaction in the PetSmart parking lot. Alternatively, the Government asserts that Forrester had reasonable suspicion of traffic violations based on his own observation that the Altima had

8

failed to maintain headlights in rainy conditions. The Government does not appear to suggest that the stop was justified based on the reference in the WhatsApp chat to the Altima having crossed a yellow line.

On this fairly minimal record, the Court cannot find that Government has met its burden to show that any traffic stop was warranted based on the transaction observed in the PetSmart lot or any related "collective knowledge" of drug violations. All the evidence showed was that Defendant's Altima pulled into the parking lot next to a "Ford" and that someone from the Ford transferred bags to the Altima's trunk. While Forrester and other officers seemed to believe and assume that this event was a drug transaction, there were no facts adduced at the hearing to specifically suggest that conclusion. While it seems that there was likely a substantial amount of additional background facts that led the officers to be surveilling this interaction, few if any of those facts were offered at the hearing. All that can be gleaned from Forrester's testimony and the minimal portion of the group chat that was introduced into evidence was that Forrester assumed that the PetSmart interaction involved drugs because he had been asked to assist with what he had been told was a drug investigation. This by itself, however, is not a "fact" but rather just a conclusory assumption.

As noted, the collective knowledge doctrine can allow the Court to consider facts known to the investigative team as a whole, and not just the specific officer

who conducted the stop. But that principle does not assist the Government here, where no facts were introduced as to what the others on the team knew as it related to the transaction involving the Altima. Again, that Forrester was simply told that this would be a drug transaction is not by itself any "fact." Thus, the Court cannot find that the Government has met its burden to show that the traffic stop was justified based on probable cause or reasonable suspicion of drug trafficking activity.

It was not necessary, however, for Forrester to know or have specific facts to suspect that the Altima was involved in drug trafficking. The traffic stop would have been permissible even if Forrester reasonably suspected nothing more than a traffic violation, such as failure to maintain headlights. The Court finds that the Government has met its burden to meet that relatively low standard.

It is undisputed that, under Georgia traffic law, cars must activate their headlights during rainy conditions. O.C.G.A. § 40-8-20. It is also undisputed that the Altima did not have its headlights activated. The factual dispute offered by Defendant was as to whether it was genuinely "raining" at the time of the traffic stop. The Court finds that Forrester had at least reasonable suspicion to believe that it was raining. Indeed, Forrester testified that it was raining, and no contrary testimony was offered from any other witness, even though other officers were present for that traffic stop along with the Defendant himself.

Moreover, the dashboard camera footage clearly shows water droplets actively hitting Forrester's windshield, requiring his wipers to clear away, as he was driving before the stop. Defendant speculates that this water was not rain, but rather was spray from the wet tires and roadway in front of Forrester's car. Defendant points out that the moisture appeared to slow or stop as the cars pulled over to a stop on the side of the road, perhaps suggesting that it had not been coming down from the sky, but rather only spraying off of the road. Defendant also points out that not all cars depicted on the video had activated their lights (although many did) and that Forrester's acts of "texting while driving" (i.e., his involvement in the group chat) was inconsistent with any perceived need for safety on the road.

The Court has little way of knowing to any certainty whether rain droplets were actually falling down from a cloud, or instead spraying up from the road, at any particular moment in the past. It is true that, according to the footage, the rain appeared to have largely stopped by the time the cars pulled over, although it appeared to start again later during the stop. It seems silly to say, but the Court can take judicial notice that rain sometimes comes and goes, and sometimes can do so suddenly. Regardless, the Government does not have to prove the exact timing and trajectory of the water droplets to a certainty. The Government's burden is simply to show that Forrester reasonably *suspected* that the Altima was driving in rain without headlights, based on specific and articulable facts.

11

Here, the Court finds no reason to question Forrester's testimony as to the conditions, which was not contradicted by any other witness account, and which was not inconsistent with the video. Indeed, the video appeared to show rain at least in real-time speed while the car was driving. Although it is possible that the water was just spray, that alternative possibility is not enough to negate the validity of a mere investigative stop.

That a slow motion frame-by-frame review of the video shows that some other cars might not have had activated their headlights (although most did), or that Forrester himself engaged in an unrelated traffic violation of texting, also does not negate reasonable suspicion. Even if Forrester could see and consider the behavior of all other cars in real-time, the law abidingness of all bystanders is not a factor in assessing whether the Defendant had committed traffic violations. And that Georgia State Patrol officers might not feel that the Georgia traffic laws apply to them is similarly no defense to those who they pull over.

While the headlight violation was undisputedly a pretextual reason for the stop, which was motivated by a desire to assist the HIDTA investigation, pretextual stops are permitted so long as they are based on the requisite facts. Here, Forrester had specific and articulable facts to reasonably suspect Defendant of having been driving without headlights in the rain. Forrester was thus permitted to initiate an investigatory traffic stop.

2. *Probable Cause for the Vehicle Search*

That Forrester was justified in pulling over the Altima does not by itself authorize a warrantless search. The Government thus argues that the search was justified by probable cause that there were drugs in the car, based on the surveillance of the transaction in the PetSmart lot and/or the application of Bull's olfactory talents.

It is not disputed the Altima was "readily mobile," and indeed the evidence shows that the Defendant had been driving the car in the moments before the stop. Thus, the automobile exception would allow a warrantless search so long as the Government can demonstrate probable cause. Probable cause exists to conduct a warrantless search when "there is a fair probability that contraband or evidence of a crime will be found in the vehicle" under the totality of the circumstances. *United States v. Tamari*, 454 F.3d 1259, 1261–62 (11th Cir. 2006) (quotations omitted). Probable cause requires more than a mere suspicion but does not require the same "standard of conclusiveness and probability as the facts necessary to support a conviction." *United States v. Dunn*, 345 F.3d 1285, 1290 (11th Cir. 2003) (*quoting Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002)).

As explained above, the Government has not shown the likelihood that the Altima was carrying drugs based on the surveillance itself or any other facts previously known to the HIDTA team. A traffic stop based on reasonable suspicion,

however, can escalate into a finding of probable cause justifying a search under the automobile exception, based on facts obtained during the stop. For example, probable cause can arise based on a positive alert by a dog specially trained to detect the odor of narcotics. *United States v. Dunkley*, 911 F.2d 522 (11th Cir. 1990); *United States v. Tamari*, 454 F.3d 1259, 1265 (11th Cir. 2006). The courts have made clear that the use of a drug detection dog to sniff the open air in a public place (such as that around a vehicle on a public roadway) is not itself considered to be a search for Fourth Amendment purposes. *See United States v. Place*, 462 U.S. 696, 707 (1983) (use of a "canine sniff" by a trained narcotics dog is not a search within the meaning of the Fourth Amendment because it is much less intrusive than a typical search); *Hearn v. Bd. Pub. Educ.*, 191 F.3d 1329, 1332 (11th Cir. 1999) ("A dog sniff of a person's property located in a public place is not a search within the meaning of the Fourth Amendment.").

We must not, however, blindly accept conclusory assertions as to what a dog's conduct means. While there is no specific litmus test by which to consider the probative value of a canine "open air sniff", the Court must generally consider the dog's training and other evidence of the reliability of the alert in the totality of the circumstances. *See Florida v. Harris*, 133 S.Ct. 1050, 568 U.S. 237 (2013).

Here, the Government adduced substantial evidence showing Forrester's and Bull's certifications, and the extent of their training and successful examination

results. Forrester also explained in detail the process in which he and Bull engaged. While not all alert activity was visible on the footage introduced into evidence, the Court was able to discern Bull moving his head excitedly at the door seams and ultimately giving the final indication of sitting down by a door. The Court credits Forrester's testimony that this activity demonstrated the likelihood that the odor of narcotics was emanating from somewhere inside the vehicle. Although not a sufficient fact to justify probable cause, the alert ended up being accurate, as the Altima was in fact carrying 10 bricks of suspected cocaine.[1]

Defendant relies on a civil summary judgment case, *Smith v. Sohn*, 696 F.Supp.3d 1162 (S.D. Fla. Sept. 29., 2023), *aff'd* 2024 WL 3688335 (11th Cir. Aug. 07, 2024), to suggest that Bull's alert should be deemed to be unreliable. The issue in *Smith* was whether a different officer using a different dog was entitled to qualified immunity as a matter of law, and whether an entry of summary judgment in the officer's favor was thus warranted, in a civil lawsuit alleging constitutional tort liability under 28 U.S.C. § 1983. A Florida-based district court denied summary judgment to the officer, and the 11th Circuit affirmed in an unpublished opinion. The district court found that triable issues of fact precluded summary

---

[1] That the cocaine was in the trunk, whereas Bull appeared to alert most excitedly at the door seams, is of little moment. Bull's task was to detect odor, which emanates from weak points and not always the closest seam.

15

judgment because a factfinder could find inconsistencies between the testimony of the officer and the video of the open air sniff. *See Smith*, 696 F.Supp.3d at 1173-74.

*Smith* is simply inapposite here, procedurally-speaking. The instant decision is not before the Court on a summary judgment-like basis, in which the Court can only make legal conclusions based on undisputed facts. The Court in this criminal suppression hearing, rather, *is* the factfinder. As such, the Court is obligated to weigh whether the police had probable cause based on a totality of the facts, including by resolving disputed facts and weighing credibility of witnesses if necessary. The Court has done so, and finds that the Government has met its burden of proof to show the reliability of Bull's identification.

Moreover, while the PetSmart surveillance was not sufficient to show the likelihood of a drug transaction by itself, it also was not irrelevant to Forrester's decision-making. These facts showed that a container had been placed inside of the Altima trunk by another individual. Forrester also permissibly concluded that Defendant's explanation of these events was suspicious. Defendant claimed that he had come to the Atlanta area to visit a girlfriend and take her belongings back to North Carolina, although he had never previously been to the "South" at all. And he did not actually take any belongings from any residence or from any female, but rather from a man who he encountered in a commercial parking lot. Forrester was entitled to question the coherence and logic of this story. Finally, Forrester by this

time had also observed and seized a firearm from inside the Altima. These facts, along with the positive alert from Bull, which the Government showed to be reliable, were more than sufficient to show probable cause that illegal drugs were inside the car. The Court finds that the search was permissible under the automobile exception and that suppression is not warranted.

### III. CONCLUSION

For the reasons explained above, the Court **RECOMMENDS** that Defendant's Motion to Suppress [66] be **DENIED**. This case is **CERTIFIED READY FOR TRIAL**.

**IT IS SO RECOMMENDED** this 29th day of October, 2024.

*Justin S. Anand*
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE